DEPARTMENT OF TIDEWATER FISHERIES ET AL.
*v.* SOLLERS ET AL.

[No. 87, October Term, 1952.]

*Decided March 13, 1953.*

*Motion for modification of opinion, filed March 19, 1953, denied April 22, 1953.*

**606**

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*Robert M. Thomas, Assistant Attorney General,* with whom was *Edward D. E. Rollins, Attorney General,* on the brief, for appellants.

*Frank T. Gray* and *William L. Marbury,* with whom were *Piper and Marbury* on the brief, for appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was instituted in the Circuit Court for Calvert County by Allan A. Sollers, Linwood T. Sollers and William R. Woodfield, individually and trading as Patuxent Oyster Company, a partnership engaged in oyster farming and packing, to enjoin the Department of Tidewater Fisheries of Maryland and its enforcement officers, Bernace P. Bowen and Roy Rafter, from arresting any of their employees while engaged in dredging oysters on the ground leased by the State to complainants and from interfering with the harvesting of oysters because of alleged violation of the cull law.

The bill of complaint alleged that the leased ground under the Patuxent River was not a natural oyster bar but had been made productive by the planting of seed oysters; that their oysters had grown to marketable size and were ready for sale on the wholesale market, but their contracts of sale could not be filled unless they could continue to harvest the oysters. The bill then alleged that defendants had informed complainants that they intended to apply the cull law against them, warning them that unless all empty oyster shells dredged up were

immediately returned to the river bottom where dredged, their employees doing the dredging would be arrested; and, in accordance with that policy, one of their employees was arrested. The bill finally alleged that it had never been the policy of the State to apply the cull law to oysters taken from leased ground; that complainants had been advised by counsel that the law did not apply to them; and that its enforcement against them would prevent them from harvesting their oysters and cause them irreparable loss.

Defendants filed a demurrer alleging that the cull law applied to complainants and could be legally enforced against them. The Court overruled the demurrer and granted a temporary injunction. Defendants thereupon answered the bill, and the Court, after hearing testimony, entered a decree making the injunction permanent. From that decree defendants appealed to this Court.

This controversy arises from the fact that Maryland has two different methods of regulating oyster culture. One is the regulation of natural oyster bars. The State defines the areas of the Chesapeake Bay and its tributaries which produce a natural growth of oysters in quantities sufficient to justify the public in resorting to those bars for a livelihood upon paying a nominal license fee. On these natural bars the State supplements the production of oysters by planting shells and seed oysters to make these bars more profitable for the oystermen.

The cull law, originally enacted in 1880 for the purpose of increasing the production of oysters on the natural bars, provided briefly that "all oysters taken from any of the waters of this State shall be culled upon their natural bed or bar." Laws 1880, ch. 198, sec. 40. That law was re-enacted in 1945, Laws 1945, ch. 929, sec. 4, and partly re-enacted in 1947, Laws 1947, ch. 604, Code 1951, art. 66C, sec. 652. It now provides as follows:

"(a) Merchantable and Unmerchantable Oysters. All oysters taken from any of the waters of this State, either with scoops, dredges or any similar instruments, or tongs or rakes, shall be

608

culled upon their natural bed or bar whence taken, and all shells shall be returned to the bed or bar from which they were taken, and all oysters whose shells measure less than three inches in length, measuring from hinge to mouth, whether attached to a marketable oyster or not, shall be included in said culling and replaced upon said bed or bar as taken; and when oysters measuring less than three inches are adhering so closely to the shell of a marketable oyster as to render removal impossible without destroying the small oysters, then such oysters, including the marketable oyster or oysters shall be returned to the bed or bar from which they were taken; and the culling of oysters taken as aforesaid required by this section shall be actually made and completed before such oysters are thrown or deposited in the hold or bottom of any boat.

"(b) Possession and Transportation of Unculled Oysters. It shall be unlawful for any person to have oysters in his possession which contain more than five percent. (5%) of shells and oysters less than three inches from hinge to mouth * * *.

"(c) Extent of Cull Law. All the provisions of this subtitle relating to the inspection and culling of oysters and the imposition of penalties for the violation of the cull law shall apply to oysters in the shell found anywhere within the State, whether afloat or ashore, and whether said oysters have been caught within the waters of this State or shipped or brought into Maryland from other states."

While the cull law increased the production of oysters temporarily, the natural oyster beds continued to be depleted, and in 1906 B. Howard Haman, member of the Baltimore bar, advocated a new system of oyster culture on barren bottoms. He drafted a bill which was

passed by the Legislature and approved by Governor Warfield on April 2, 1906. Fourth Report, Shell Fish Commission of Maryland (1912), 287, 288. The Haman Act created the Board of Shell Fish Commissioners of Maryland, and directed the Commission to lease, in the name of the State of Maryland, to residents of Maryland parcels of land beneath the waters of the State for the purpose of oyster culture. No person was permitted to acquire more than 10 acres within the limits of any county or more than 100 acres in any other place. The terms of the leases were for 20 years. The annual rent was $1 per acre for each of the first two years; $2 per acre for the third year; $3 per acre for the fourth year; $4 per acre for the fifth year, and $5 per acre during the remainder of the term. The Act provided that, except in four particulars, the relation of landlord and tenant should have all the incidents attaching to that relation as it existed under the laws of Maryland. The Act expressly provided that the lessee should have "exclusive ownership of and title to all oysters planted by him or existing on the land leased," and that he could take such oysters "in any manner and at such times as may be desired by the holder of such land as allowed by the existing laws of this State." Laws 1906, ch. 711, secs. 84, 98, 105, 109, 112.

In 1941 the Legislature created the Commission of Tidewater Fisheries and conferred upon it general supervisory power, regulation and control over the fish, crabs, terrapin, oysters, clams and other shellfish within the bounds of tidewater. Laws 1941, ch. 508, Code 1951, art. 66C, secs. 6, 7; *Clark v. Todd,* 192 Md. 487, 493, 64 A. 2d 547.

Defendants relied heavily upon a *dictum* in the opinion of this Court in *Windsor v. State,* 103 Md. 611, 618, 64 A. 288, 291, 12 L. R. A., N. S., 869. In that case the defendant was tried on the charge of violating the cull law by having in his possession oysters containing more than 5 per cent of shells and oysters measuring less than 2½ inches from hinge to mouth. He pleaded

that the oysters had been taken from beds belonging to private owners. On June 15, 1906, the Court held that the cull law was applicable to oysters taken from areas appropriated by private planters as well as to oysters taken from natural bars. Judge Pearce made the following statement in the opinion: "If oysters taken from private lots are not required to be culled, then under the operation of the Haman Law, the natural beds and bars might, and almost surely would, be depleted of young oysters, to be planted upon private lots, and which could be sold as merchantable oysters, whenever the greed or necessity of the private planter might incline him to such course."

We are unwilling to accept that *dictum* as a precedent. The defendant had been tried, convicted and sentenced before the Haman Act was passed. In 1829 the Legislature had authorized any citizen of Maryland to appropriate any barren area, not exceeding one acre, for bedding or sowing oysters. Laws 1829, ch. 87. In 1865 the Legislature authorized any landowner to appropriate not more than five acres of contiguous water. Laws 1865, ch. 181, sec. 22. The provisions of the Haman Act, however, were entirely different from the provisions of the prior statutes. We now have the opportunity to examine not only that Act, but also many amendments which have been made to it during the past 47 years.

We do not overlook the statement in the cull law that its provisions apply to "oysters in the shell found anywhere within the State." It was in view of that positive language that we held in *Christy v. Clark,* 195 Md. 66, 72 A. 2d 718, that the cull law, making it unlawful to possess oysters which contain more than 5 per cent of shells or measure less than 3 inches from hinge to mouth, may be applied to oysters caught in another State and brought into Maryland, even though they had been taken from privately planted beds. We considered that, since Maryland has no particular interest in the methods of private oyster culture in other States, the source from which the oysters came was immaterial.

It is important, however, to keep in mind that the meaning of the plainest language in a statute may be controlled by the context, and if the language is fairly susceptible of more than one construction, the Court may seek the legislative intention by considering the facts of contemporary history, the prior state of the law, and the particular evil, abuse or defect which the statute was designed to correct and the remedy which was intended. The statute should then be so construed that all of its parts harmonize with its general scheme to effectuate the legislative purpose. *Pittman v. Housing Authority of Baltimore City,* 180 Md. 457, 25 A. 2d 466; *Smith v. Higinbothom,* 187 Md. 115, 125, 126, 48 A. 2d 754; *City of Baltimore v. Biermann,* 187 Md. 514, 50 A. 2d 804; *Maguire v. State,* 192 Md. 615, 65 A. 2d 299; *United States v. Union Pacific R.. Co.,* 91 U. S. 72, 23 L. Ed. 224, 228. Thus, where a general intention is expressed in a statute, and also a particular intention incompatible with the general intention, the particular intention is considered in the nature of an exception. *Stockett v. Bird's Adm'r,* 18 Md. 484, 489; *State, to Use of Mertens v. Moore,* 108 Md. 636, 639, 71 A. 461.

Here we consider two sections of Article 66C, title "Natural Resources," sub-title "Oysters and Clams." The question to be decided is whether Section 652, requiring the culling of oysters, is applicable to Section 661, which provides for oyster culture by private planters.

The existing private oyster culture law contains three sub-sections which strongly indicate that the cull law is not intended to apply to oysters taken by private planters.

Sub-section 661(p) provides: "The lessee of any land leased for the purpose of planting and cultivating oysters shall have exclusive ownership of and title to all oysters planted by him or existing on the land leased; and the relationship of the State and the lessee shall be that of landlord and tenant, and so long as such lease shall be in force, both the State and the lessee shall have

all the rights and privileges of landlord and tenant as defined in the laws of Maryland, except as follows:

"First: Land leased under this sub-title shall be used only for the purpose of planting and cultivating oysters;

"Second: Residents of this State shall have the right to crab or fish upon all leased areas, provided they do not remove or destroy oysters thereon;

"Third: No right shall exist to redeem or purchase any land of the State so leased; and

"Fourth: Any other modification caused by the provisions of this sub-title."

It is observed that the statute confers upon the lessee the exclusive ownership of all oysters and also all the rights and privileges of a tenant except in four particulars. It is significant that among the restrictions there is no requirement that the lessee shall cull his oysters.

Sub-section 661(t) provides: "A lessee is privileged to cultivate or remove oysters so planted on his leased area in any manner that he deems proper, provided he has complied with the law providing for the licensing of boats or tongers in removing them for market or transplanting * * *."

It seems to us rather significant that the right of the lessee to remove his oysters in any manner that he deems proper is not limited as long as he has his license.

Sub-section 661(x) provides: "It shall be lawful for any bona fide lessee to take oysters at any time from his leased land for private use or for the purpose of planting or cultivating, or for sale for planting by other lessees * * *."

The fact that this sub-section expressly states that a lessee has the right to take his oysters from his leased land at any time for planting or cultivating, without any reference to culling, gives additional strength to the interpretation that he may take up his oysters of any size without the necessity of culling.

We now turn to the testimony to find out whether there is any reason why the cull law ought to be applied

to oysters taken by private planters, for it is presumed that the Legislature intends to impart to each of its enactments a meaning that will render it operative and effective. In case of doubt, the Court will construe an enactment in such a way as to carry out that purpose.

John E. Clark, former Chairman of the Tidewater Fisheries Commission, testified that it was true that in several areas on the Eastern Shore, where oysters set naturally, the planters had found it advantageous to throw back the shells with the prospect that they would get a natural set of oysters and thus avoid the expense of buying seed oysters. But he said that in all other sections of the State the lessees plant seed oysters on barren ground that will not set oysters naturally. He further testified that it had been the understanding of the Commission that the private planter, having a lease of the bottom, has the title to all the oysters and shells, and therefore when he removes the oysters they are still his property, and when he takes the oysters and shells to his packing plant he does not violate the cull law, because that law applies to the natural oyster bars, to which all oyster shells must be returned.

A similar distinction was made in the Court of Appeals of New York in *People v. Hazen,* 121 N. Y. 313, 24 N. E. 484, 485. That case presented for construction an Act of the New York Legislature making it unlawful for any person to take any oysters or other shellfish in South Bay in Suffolk County with a dredge or drag. It was shown that the defendant had dredged for oysters from a private lot, which had been leased by the town of Brookhaven after it had been found that there were no oysters on it. The Court of Appeals decided that the statute was not applicable to persons taking their oysters out of private lots. Judge Peckham explained in that decision: "No claim is made that the defendant did not bring himself within all the conditions necessary to make the lot where the oysters were taken, a private lot, and the oysters themselves his private property. * * * The defendant being thus the absolute owner of

the oysters which he had planted in this private lot, can it be claimed with any plausibility that the Legislature meant to deprive such an owner of his right to take his own oysters from the bed of his private lot by means of a dredge or drag? We think not. * * * It seems to us clear that the intent of the legislature to be gathered from the title, is an intent to provide a rule of conduct for all persons engaged in the work of dredging for oysters, etc., of a natural growth, and which do not belong as private property to some individual, and which are not contained in a private lot."

In the case before us complainants maintained that oysters will not grow in the Patuxent River unless they are cultivated by planting seed oysters obtained from other bottoms. Accordingly complainants have the expense, which oystermen on the natural bars do not have, of buying and transplanting seed oysters. They declared positively that if the cull law is enforced against them, their business will be ruined and the purpose of the private oyster culture law will be defeated.

Dr. R. V. Truitt, biologist at the Chesapeake Biological Laboratory at Solomons, testified as an expert that it would generally be detrimental, if not ruinous, to apply the cull law to private planters. He gave four reasons for his opinion: "Firstly, in the absence of a set, it would be necessary to use considerable labor, to no purpose, to get a set, considerable labor to cull the crop. Secondly, to throw the shells back would foul the bottom, from the viewpoint of oyster culture. * * * Thirdly, in leaving them on the bottom, there would be a cumulative effect, in which the shells would grow deeper and deeper every year, * * * with increasing expense, increasing handicap, and decreasing income. The fourth reason would be the fact that throwing shells over such oysters as are on the bottom, they remain on the bottom, having escaped the dredge, as evidently they do to some extent; particularly little ones that would be thrown back * * * most likely would be smothered by a deep deposit of shells that, as I see it, inevitably would accumulate in

the culling operation in contrast to clean bottom farming."

It may also be observed that if the private planters were compelled to put the shells back in areas where they would not catch spat, they would not have shells for areas where they would catch spat, thus frustrating the purpose of the law intended to be encouraged.

It was further shown that, during the period of over 45 years, from the passage of the Haman Act in April, 1906, until the beginning of the present controversay in November, 1951, no private planter was ever prosecuted for failing to cull his oysters. Three former members of the Tidewater Fisheries Commission, the Director of the Department of Research and Education, and the Assistant to the Chief Fisheries Inspector testified that it had never been the policy of the Commission to enforce the cull law against private planters.

It is true that no custom, however long and generally it has been followed by administrative officials of the State, can nullify the plain meaning and purpose of a statute. But where the language of a statute is susceptible of two constructions, a long continued and unvarying construction applied by administrative officials is a persuasive influence in determining the judicial construction, and it should not be disregarded except for the strongest and most urgent reasons. *American-Stewart Distillery v. Stewart Distilling Co.*, 168 Md. 212, 217, 177 A. 473; *Bouse v. Hutzler*, 180 Md. 682, 687, 26 A. 2d 767, 141 A. L. R. 843.

Furthermore, it is an accepted rule that, although the construction of a statute is a judicial function, the Court, in seeking its meaning, has the privilege of availing itself of the construction put upon it by the Legislature through long continued acquiescence in the administrative construction. The fact that the administrative construction has received the tacit approval of the Legislature during many of its sessions furnishes a strong presumption that the statute has been construed correctly. *Smith v. Higinbothom*, 187 Md. 115, 133, 48

616

A. 2d 763. The Maryland cull law was enacted 73 years ago, and the Maryland private oyster culture law was enacted 47 years ago. Yet, notwithstanding the State's long and unvarying policy of not enforcing the cull law against private oyster planters, the Legislature has never explicitly declared the law to be otherwise.

For the reasons stated we hold that the cull law is not applicable to oysters gathered by private planters from their leased lots. We will therefore affirm the decree of the Circuit Court granting the permanent injunction.

*Decree affirmed, with costs.*