652 A.2d 1138

Lottie L. ANKNEY, et vir

v.

William F. FRANCH, et al.

No. 348, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Feb. 1, 1995.

88

Marcus Z. Shar (Bierer, Shar & Allentoff, PA, Baltimore, Jack J. Schmerling, Glen Burnie, and Cynthia E. Young, Annapolis, on the brief), for appellants.

Ronald G. Dawson (Smith, Somerville & Case, on the brief), Baltimore, for appellees.

Argued before ALPERT, WENNER and DAVIS, JJ.

DAVIS, Judge.

## INTRODUCTION

The challenge to the lower court's judgment presented by appellant Ankney stems from rulings by the Circuit Court for Anne Arundel County that struck the testimony of two witnesses offered by Ankney as experts in workers' compensation law and consequently determining that there was no evidence of malpractice committed by appellee Franch, Ankney's lawyer. He had counselled her that she would not succeed in appealing an adverse decision of the Workers' Compensation Commission (the Commission) opining that Ankney was barred from future workers' compensation benefits because of her settlement with a third party. Thus, this appeal is principally a review of whether the trial judge, in his evidentiary ruling and interpretation of the pertinent law, erred in

granting Franch's motion for judgment in essence determining that Ankney had not produced sufficient evidence to sustain a claim for malpractice. Before reaching the question of whether Franch's advice constituted legal malpractice, we must decide whether the decision of the Workers' Compensation Commission opining that Ankney's settlement barred recovery of future benefits was wrong and whether the state of the law was such, at the time of Franch's advice, that he exercised the proper standard of care in rendering his advice and his assessment of Ankney's chances for success.

The purpose and objective of workers' compensation statutes are to insure that an employee who is injured during activity which benefits the employer will be compensated without regard to the fault of the employer. The employee, on the one hand, is not left without a remedy when he or she is injured through no fault of the employer, and the employer, at the same time, avoids the disruption of business by reason of burdensome lawsuits having the potential of crippling the business enterprise. It is the clearly-stated policy of such statutes, including Maryland's statute, MD.ANN.CODE, LABOR AND EMPLOYMENT, § 9–101 et seq., to carry out a beneficent purpose and to vest liberally in employees, injured during or in the course of their employment, benefits pursuant to a preset schedule according to the degree and duration of physical impairment.

While the benevolent purpose of the statutes is the cardinal principle in determining the rights of the parties, this case presents the question of how to achieve the beneficent purpose of the statute while not impairing an employer's right to be reimbursed by a third party who has caused the injury.

### THE INSTANT CASE

Appellant Lottie L. Ankney [1] brought suit against appellees William F. Franch, et al., alleging legal malpractice in

---

1. Appellant's husband was a co-plaintiff in the suit against Franch, hence, the appendage of "et vir" in the caption of this appeal. We will,

Franch's handling of a workers' compensation claim. The malpractice claim proceeded to trial in August 1993. At the close of Ankney's case, the Circuit Court for Anne Arundel County struck the entire testimony of Ankney's two expert witnesses and granted Franch's motion for judgment.

Ankney presents the following questions for our review, which we restate for clarity:

I. Did the trial court err as a matter of law in striking the entire testimony of plaintiff's expert witnesses?

II. Did the trial court abuse its discretion in striking the entire testimony of plaintiff's expert witnesses?

III. Did the trial court err in granting defendant's motion for judgment, when expert witnesses were unnecessary and the court could have instructed the jury on the relevant points of law?

## FACTS

In January 1982, Lottie Ankney injured her back during the course of her employment at Maritel Enterprises. Ankney had been sent to purchase lunch for a work-related meeting. Returning from that errand, she slipped on the ice and fell in a parking lot owned by Beerfoot Enterprises, Inc. Following a hearing in April 1982, the Workers' Compensation Commission awarded Ankney benefits from the date of the fall. Ankney's attorney in those proceedings was Samuel H. Paavola. Pursuant to an insurance policy with Maritel, the benefits were to be paid by Aetna Casualty & Surety Insurance Company (Aetna).

According to Ankney, Aetna was slow in paying covered medical expenses. After one of her treating physicians filed suit, Ankney complained to Paavola, who negotiated a third-party settlement with Beerfoot's insurance company. From the $6,500 settlement, Paavola retained roughly $1,900 in

---

however, for the sake of simplicity, refer only to Ankney since none of the issues addressed are affected by her husband's claim for consortium.

attorney's fees. Ankney testified that the balance went to pay covered medical expenses. She also testified that Aetna continued to be slow in paying her medical bills:

> They paid a few of them, off and on, you know. But, uh, they didn't pay all of them. In fact, when I was cut out completely from Working—Workman's [sic] Comp, Mr. Franch still had quite a few bills there that hadn't been paid. And from the time limit that it was cut off, I had quite a few bills that they should have paid, you know, before that, and I never got it.

Ankney eventually discharged Mr. Paavola and retained the appellees, William F. Franch and the firm of Franch, Earnest & Cowdrey, P.A. On January 22, 1985, Franch appeared before the Workers' Compensation Commission at a hearing on Ankney's claim. Aetna advised the commissioner that Ankney had settled her third-party claim against Beerfoot without Aetna's knowledge or consent. By order dated January 29, 1985, the Commission ruled that Ankney's claim for benefits was terminated by the unauthorized settlement, and further compensation after that date was denied. No appeal was taken. In April 1986, Ankney's petition to reopen the case was also denied.

Ankney's back condition grew progressively worse, and she underwent surgery in 1988 and 1991. She made several attempts to return to work, but was unable to do so. At trial, Ankney presented evidence that, as of the date of the fall, she suffered from a sixty-eight percent functional impairment of her back, and was one hundred percent disabled from employment. There was also expert testimony that she probably will suffer gradual deterioration and will, over the years, become "much worse than she is now."

The gravamen of Ankney's complaint is that Franch gave her bad advice regarding the merits of an appeal from the Commission's decision to terminate her benefits. She further contends that Franch greatly overstated the cost of pursuing an appeal. According to Franch, Ankney elected not to proceed after being properly advised on those matters. It is

not disputed that Franch requested an advance of $2,500 toward the cost of an appeal, including the expense of expert witnesses. Ankney testified that Franch "seemed to think that I didn't have a chance of, you know, getting anywhere with going to the Circuit Court." By letter dated February 28, 1985, Franch stated:

> This letter will confirm a telephone conversation which we had on Monday, February 25th, at which time I told you that I did not believe that an appeal could be successful and for that reason it was mutually agreed that there would be no appeal taken.

Ankney testified that she did not have the $2,500, "[b]ut if I thought that I had a chance of getting my Workman's [sic] Comp back, I would have borrowed it from my brother or from someone."

Prior to trial, Ankney proposed to offer expert testimony from two practicing workers' compensation attorneys: Herbert Arnold and Harold DuBois. Both witnesses were prepared to testify regarding the appropriate standard of care. After taking their depositions, Franch filed a memorandum arguing that Ankney's experts should be excluded because their opinions were based on "an erroneous assumption as to the applicable Maryland law."

At trial, both experts testified that the Commission had erred in terminating Ankney's benefits. Mr. Arnold explained:

> I believe that the only action against Mrs. Ackney [sic] should have been a credit against any future award of compensation, and that her case should have remained open subject to credit. I believe if Aetna, having been represented by Mr. Paavola, since they're a subrogee of Mrs. Ackney [sic] here, if they felt that they had some grievance against him for settling the case, then they should have—should have taken an action against him as far as a breach of any alleged subrogation rights are concerned, or an alleged breach of subrogation rights. But as far as the Workers'

Compensation claim is concerned, absolutely not. It should have stayed open subject to a credit.

Mr. Dubois also testified that the Workers' Compensation Commission erred when it terminated Ankney's claim, and opined that Ankney would have been successful on appeal. With regard to the advance that Franch requested, Dubois testified that the amount was "excessive" because "there was only one limited issue in this case," and it would have been decided on summary judgment without any need for expert witnesses.

With respect to the amount of workers' compensation benefits lost by Ankney as a result of the alleged failure by Franch to exercise the proper standard of care, the following colloquy transpired:

Q (By Mr. Shar) Based upon your education, training, experience and expertise in the area of Workman's [sic] Compensation law, uhm, do you have an opinion what, if any Workman's [sic] Compensation protection Lottie Ankney lost as a result of the Defendant's breaches of the generally accepted standards of legal practice?

A As a result of being terminated by—as a result of her benefits being terminated?

\* \* \* \* \* \*

A The opinion is that first of all, I believe she has lost— she lost her medical benefit, a lifetime medical benefit for the injuries which are causally related to that particular accident.

Q What do you mean by medical benefit?

A Medical expenses. The doctors, the hospitals, the prescriptions, the, uh, uh, what other incidental expenses would be required.

Q Okay.

A In addition to that, she lost compensation for her— her lost time from work, and for her disability.

Q All right.

A She lost her temporary-total disability compensation, she lost her permanent-partial disability compensation, and/or her permanent total disability compensation payments. And when I talk about the temporary-total, permanent-partial and permanent-total, I'm talking about dollars that the insurance company would be obligated to pay her had it not been for the, uh, uh, uh, closing out of this case.

\*　　\*　　\*　　\*　　\*　　\*

Q Do you need it to refresh your recollection?

A Well, we're getting involved in dates here. What I—what I said was, that on November 7th, 1980—'83 the medical evidence showed this woman was totally disabled, and if they had pursued this matter to appeal and they had been successful in having the Court determine that her benefits were not cut off, temporary-total and/or permanent-total disability Compensation for the period November 7th, 1983 up until the time of my deposition would have been around five hundred and three weeks. Her Compensation—Mrs. Ankey's (sic) Compensation rate, based on her average weekly wage at the time of her accident, was a hundred and seventy-seven dollars a week. So, we call that accrued benefit, five hundred and three accrued—five hundred and three weeks of accrued benefits at a hundred and seventy-seventy [sic] dollars, would have been eighty-nine thousand, thirty-one dollars, and that would have just been from 19—from 1983 until July of '93, a period of a little less than ten years.

Q And would the—would the Compensation benefits stop at that time?

A No. If a person is considered to be—if the Commission had believed, and if a person is considered to be permanently and totally disabled, they would be entitled to a life-time benefit.

\*　　\*　　\*　　\*　　\*　　\*

A Yeah. What I did is I used the—I got them this time—I didn't have it the last time, the Vital Statistics of the United Stated of 1987, and in this is commonly referred

to as the Life Tables published by the National Center for Health—these are health statis—statistics. And Mrs., uh, uh, Ankey (sic) in—July of 1993 was—

Q   At the time of your deposition?

A   —right, is fifty-seven years old. So, a person at age fifty-seven in July of 1993, according to the United States Government Life Tables has another twenty-five point two years of life remaining. So, that be the case, if she had lived, according to Uncle Sam, another twenty-five point two years, that would be another one thousand, three hundred and ten more weeks, again multiplying that by a hundred and seventy-seven dollars a week, we're talk—now talking about another two hundred and thirty-one thousand, nine hundred and forty dollars, if they—if the insurance compa- ny—if she was found permanently and totally disabled, and she got benefits for the rest of her life, and she lived to age, uh, fifty-seven—fifty-seven and twenty-five is eighty-two.

Q   And what would that total?

A   That would have been two thou—two hundred and thirty-one thousand, nine hundred and forty. That, coupled with what we—what I referred to before as the accrued compensation, the eighty-nine thousand, we're talking now around three hundred and twenty thousand dollars worth of benefits that are being potentially deprived because Com- missioner Rosenbaum cuts off Mrs. Ankey's (sic) Compensa- tion.

Q   Now, is that three hundred twenty thousand dollars, does that absorb the medicals? That lifetime medicals?

A   No, that's just annuity. That's just Compensation dollars in her pocket. That does not take into account her medical expenses, prescriptions, doctors, hospitals, things of this nature.

Q   Would—would that also be covered?

A   Certainly, it would have been covered, if the case is still, what we call alive, or still open.

Q   Do those figures, the three hundred twenty-thousand dollars and the—the life-time of medicals, uhm, do those

figures include physical pain that Mrs. Ankney had to suffer during the years that she unable to get medical attention because she lost her Worker's [sic] Compensation?

A No.

Q Do they include, uh, her emotional pain and trauma that she had to go through as a result of being unable to work, without income, without money coming in from—

A No, this—this again, is strictly dollar replacement for salary. This doesn't take into consideration any other factors.

At the close of Ankney's case, the court granted Franch's motion to strike the testimony of both experts. The judge explained:

Now, as I said, I considered the *Western Railway Company* case in 163 Maryland 97 [161 A. 5] [ (1932) ] as the only authority, at least the only guiding authority in—on this case. And I am satisfied that one reading of that case would clearly be that the, uh, uh, Commissioner is right in cutting off the claims. Now, I—I said, that would be a logical extension of that case. I also have some problems as to whether that would be the current law. Now, to take the position that the only alternative would be for a credit, I think is just a complete misstatement of the law. I don't accept that. I believe that the insurance company certainly would have a right to show that the actions—were prejudicial.

Because the court's ruling left Ankney without expert testimony on the appropriate standard of care, the court also granted Franch's motion for judgment. From those rulings, Ankney noted the present appeal.

## LEGAL ANALYSIS

The questions presented by Ankney may be condensed into two broad issues. We first consider the law that would have governed an appeal from the termination of Ankney's benefits, then address the ultimate question: did the trial court err or

abuse its discretion in striking the entire testimony of Ank-ney's expert witnesses?

## I

When an employee suffers injury or occupational illness in the course of his or her employment, the employer[2] is required to pay compensation under the terms of the Workers' Compensation Act (the Act), MD.CODE ANN., LAB. & EMPL. (LE) § 9–101 *et seq.* (1991 Repl.Vol.) (formerly MD.ANN. CODE, art. 101).[3] In cases involving a tortious third party, the original version of the Act created an election of remedies: the employee was required to choose between a statutory claim against the employer, or a common law tort claim against the third party. *Hagerstown v. Schreiner*, 135 Md. 650, 653, 109 A. 464 (1920). If the employee filed a claim under the Act, the employer was granted the right to proceed against the third party. Amendments adopted in 1920 and 1922 abolished the election of remedies and granted the employee the right to sue the third party if the employer had not done so within two months following the initial award of compensation under the Act. *See Brocker Mfg. v. Mashburn*, 17 Md.App. 327, 332–35, 301 A.2d 501 (1973) (discussing the history of the Act with regard to third-party claims); LE § 9–902(c). Thus, the employer has an exclusive right to proceed against a third party for the first two months after the initial award; thereafter, the covered employee has an equal right to bring suit.

Because the employer and employee both have an interest in the third-party claim, the statutory scheme carefully provides for the distribution of any damages recovered. An

---

**2.** For the sake of clarity, we refer throughout to the employer and the employee, recognizing that others may assert the interests of those parties. *See, e.g.,* LE § 9–902(a) (third party action may be brought by "self-insured employer, insurer, the Subsequent Injury Fund, or the Uninsured Employers' Fund"); LE § 9–902(c) (in case of death, action may be brought by dependents of covered employee).

**3.** The relevant sections of the workers' compensation statute were recodified without substantial change in 1991.

employer who recovers damages in excess of the costs and compensation awarded must pay the full amount of the excess to the injured employee. LE § 9–902(b). When the employee recovers damages, the employer must be reimbursed for any compensation already paid and awarded, and any amounts paid for medical services, funeral expenses, or other purposes enumerated in the Act. LE § 9–902(e). *See also Western Maryland Railway Co. v. Employer's Liab. Assurance Corp.*, 163 Md. 97, 102–03, 161 A. 5 (1932) (holding that the terms of a settlement agreement between the employee and a third party violated the employer's statutory right to be reimbursed from the proceeds of the settlement).

It is firmly established that the Act does not give the employer a separate right of action against a tortious third party. *Smith v. Bethlehem Steel Corp.*, 303 Md. 213, 221–22, 492 A.2d 1286 (1985). As the Court of Appeals observed in *Western Maryland Railway*, 163 Md. at 104, 161 A. 5, "[t]here is only one claim, and that is of the one injured, or his dependents in the case of death, and one judgment, the division of which is fixed by statute." The employer's rights are purely derivative, and by way of subrogation. *Erie Insurance Co. v. Curtis*, 330 Md. 160, 164, 623 A.2d 184 (1993); *Johnson v. Miles*, 188 Md. 455, 459, 53 A.2d 30 (1947). In *Erie Insurance*, 330 Md. at 162–64, 623 A.2d 184, the Court explained that this subrogation interest constitutes a statutory lien on the employee's recovery in a third-party action. *See also* RICHARD P. GILBERT & ROBERT L. HUMPHREYS, JR., MARYLAND WORKERS' COMPENSATION HANDBOOK, § 16.1–5, at 325 (2d ed. 1993). In recognition of that interest, the employer has an absolute right to intervene in a third-party action filed by the covered employee. *Collins v. United Pac. Ins. Co.*, 315 Md. 141, 145, 553 A.2d 707 (1989). *See also Johnson*, 188 Md. at 460, 53 A.2d 30 (employer's statutory interests are satisfied when the employer is given an opportunity to "intervene and control" the third-party suit and obtain reimbursement out of any recovery).

In the case at hand, Aetna's subrogation rights for any benefits paid after the date of the settlement were destroyed by Ankney's unauthorized settlement. *See Cleaveland v. C & P Telephone Co.,* 225 Md. 47, 51–52, 169 A.2d 446 (1961).[4] The merits of Ankney's legal malpractice claim turn, in part, on whether the Commission properly terminated Ankney's benefits as a consequence of that settlement. In their handbook on workers' compensation law, Gilbert and Humphreys suggest:

> The claimant may not impair the lien with impunity. The claimant should not settle the claim "out from under" the lienholder by reaching a separate accommodation with the third-party tort-feasor. Impairment of the employer/insurer's rights by the vehicle of a *de minis* [sic] settlement could foreclose the claimant's future rights in workers' compensation proceedings and require a disgorging of the employer/insurer's monetary interest.

GILBERT & HUMPHREYS § 16.1–5, at 325 (citations omitted). Whether a covered employee's future right to compensation must be foreclosed as a consequence of an unauthorized settlement has yet to be decided by this Court or the Court of Appeals. In considering that issue, we strive to strike an appropriate balance between the employer's right to subrogation and the claimant's right to compensation under the Act.

In granting the motion to strike the testimony of Ankney's experts, the trial court relied heavily on *Western Maryland Railway.* There, the injured employee entered a third-party settlement that provided for payment of a certain sum apart from, and in excess of, any workers' compensation benefits

---

**4.** In *Cleaveland,* the Court of Appeals concluded that, when an unauthorized settlement is reached *after* the insurer pays a claim, the settlement and release will not bar the subrogee's right of action against a third party. *See Cleaveland,* 225 Md. at 52, 169 A.2d 446 (reviewing both cases and insurance treatises which generally take that position). When the unauthorized settlement is reached before the claim is paid, however, the insurer's right of subrogation is destroyed. *Cleaveland,* 225 Md. at 51–52, 169 A.2d 446; *Noma Elec. Corp. v. Fidelity & Dep. Co.,* 201 Md. 407, 412, 94 A.2d 277 (1953). *See also Packham v. German Fire Ins. Co.,* 91 Md. 515, 526–28, 46 A. 1066 (1900).

received. *Id.* 163 Md. at 100, 161 A. 5. The agreement further stipulated that the release contained therein should "not operate to release or discharge, or in any way affect" the insurer's subrogation rights. The Court of Appeals concluded:

> As the appellants construe [the Workers' Compensation] act, the alleged tort-feasor can settle with the employee, by entering into an agreement whereby the settlement is stated to be in excess of or in addition to any amount which the insurer might recover against them. In our opinion such a settlement cannot be made without the acquiescence of the insurer.

*Id.* at 102–03, 161 A. 5. The Court noted that the effect of the settlement was "to split a single cause of action into two causes" in contravention of the well-established principle that there is "only one claim, and that is of the one injured." *Id.* at 103–04, 161 A. 5.

A close reading reveals that the case is not directly applicable here. Under article 101, § 58, an employee was not entitled to receive funds from a third-party tort-feasor until *after* the employer had been reimbursed for "compensation already paid or awarded and any amount or amounts paid for medical or surgical services." *Western Maryland Railway,* 163 Md. at 102, 161 A. 5. The settlement reached was squarely in conflict with that provision, and the Court properly concluded that "*such a settlement* cannot be made without the acquiescence of the insurer" (emphasis added). *Id.* at 102–103, 161 A. 5.[5]

Moreover, the appeal in *Western Maryland Railway* was brought from an order restraining the settlement. *Id.* at 98, 161 A. 5. The employee's claim for benefits under the Act had not been terminated, and there is nothing in the decision

---

5. The Court also concluded that under the express terms of the release signed by the third party, the insurer's subrogation rights were not destroyed by the settlement. As the Court explained, the insurer was entitled to receive the amount of money that the third party agreed to pay the employee, "and as much more as it may recover in its suit against them to the extent of its obligation under the award." *Western Maryland Railway,* 163 Md. at 105, 161 A. 5.

directly supporting the proposition that the Commission could terminate an employee's claim solely on the basis of an unauthorized third-party settlement. The opinion does state, however, that an employee "cannot settle with the one causing him loss, except *with the acquiescence of the insurance company* without putting into peril his status with the latter." *Id.* at 103, 161 A. 5 (quoting *Packham,* 91 Md. at 523, 46 A. 1066). The precise nature of that potential peril is never clearly stated.

## II

In many jurisdictions, an employee who settles a third-party claim without the employer's consent forfeits any future right to workers' compensation benefits. *See* 2A ARTHUR LARSON, THE LAW OF WORKMEN'S COMPENSATION § 74.17(a), at 14–428 (1992). Among jurisdictions that reach that result, the great majority have concluded that termination of benefits was required by the relevant statute. *See* 4 LARSON, Appendix C, Table 21, at 574.42 (listing twenty-four states whose workers' compensation statutes require an employee to obtain the employer's consent before reaching a third-party settlement); 2A LARSON § 74.17(a), at 14–428–14–440 (citing cases construing many of those statutes). In some cases, the applicable statute expressly states that all rights to compensation "shall be terminated" if the employee reaches a third-party settlement without the employer's written approval. *See, e.g., Parmelee v. International Paper Co.,* 157 A.D.2d 878, 550 N.Y.S.2d 150, 151 (1990). *See also Nicklos Drilling Co. v. Cowart,* 927 F.2d 828, 831 (5th Cir.1991) (construing the Longshore and Harbor Workers' Compensation Act). Other courts have concluded that termination of the employee's benefits was necessary to protect the employer's subrogation rights and to prevent the employee from reaching an unreasonably small settlement. In *Hornback v. Industrial Comm'n,* 106 Ariz. 216, 474 P.2d 807, 810–11 (1970), the Supreme Court of Arizona noted that the statute expressly required the employer's written approval for any third-party settlement that was less than the compensation awarded. The

Arizona court concluded that termination of the employee's benefits was required to give full effect to the statute's approval provision. The Supreme Court of Virginia reached an identical conclusion in *Safety–Kleen Corp. v. Van Hoy,* 225 Va. 64, 300 S.E.2d 750, 753–54 (1983). In Indiana and North Carolina, state legislatures have adopted yet a third approach. In those states, the workers' compensation statute provides that a third-party settlement shall not be valid without the written consent of both the employer and employee. *See State v. Mileff,* 520 N.E.2d 123, 128 (Ind.Ct.App.1988); *Williams v. International Paper Co.,* 324 N.C. 567, 380 S.E.2d 510, 512–13 (1989).

Among those states in which the statute is silent, as in Maryland, there appears to be a diversity of opinion. As the Supreme Court of Minnesota explained in *Lang v. William Bros. Boiler and Mfg.,* 250 Minn. 521, 85 N.W.2d 412 (1957):

> [I]n what appears to be a majority of the states, the employee is allowed to make the [unauthorized] settlement, and still collect compensation, but the employer is not thereafter precluded from recovering from the third party the amount it must pay, in spite of the settlement.
>
> Underlying all these cases seems to be the general thought that the employer, having been given a right of indemnification for compensation paid, should not have that right affected by a settlement to which he is not a party....

*Id.* 85 N.W.2d at 417 (citations omitted). *See also United Steelworkers of America v. Quadna Mountain Corp.,* 435 N.W.2d 120, 122 (Minn.App.1989) (citing *Lang* with approval). *See generally,* 2A LARSON § 74.17(e), at 14–454–14–462. This approach, unfortunately, is plainly inconsistent with Maryland law. As we noted earlier, Aetna's subrogation rights for any benefits paid after the date of the settlement were destroyed. *Cleaveland,* 225 Md. at 51–52, 169 A.2d 446. *Compare Traveler's Insurance Co. v. Haden,* 418 A.2d 1078, 1082 (D.C.App. 1990) (reaching a similar conclusion).

Regardless of the position that other states may take, our task here is to determine the meaning and intent of

our own statute, and give full effect to the legislative purpose or policy. *Privette v. State,* 320 Md. 738, 744–45, 580 A.2d 188 (1990); *Tracey v. Tracey,* 328 Md. 380, 387–88, 614 A.2d 590 (1992). Although the language of the statute is the primary guide to legislative intent, *Tracey,* 328 Md. at 387, 614 A.2d 590, we must also consider the legislative history, as well as the prior state of the law and the "particular evil, abuse or defect" that the statute was designed to correct. *Department of Tidewater Fisheries v. Sollers,* 201 Md. 603, 611, 95 A.2d 306 (1953). The workers' compensation statute itself states that the law must be "interpreted and construed as to effectuate its general purpose." Art. 101, § 64; *see also* LE § 9–102. The benevolent purposes of the law require that any ambiguities be liberally construed in favor of injured employees, insofar as the language of the statute will allow. *Lovellette v. Mayor and City Council of Baltimore,* 297 Md. 271, 282, 465 A.2d 1141 (1983); *Bethlehem–Sparrows Pt. Shipyard, Inc. v. Hempfield,* 206 Md. 589, 594, 112 A.2d 488 (1955).

As Ankney points out, our workers' compensation statute carefully sets forth the grounds for termination of an employee's benefits. *See, e.g.,* LE § 9–903 (employee's third-party recovery terminates case *unless* amount recovered is less than compensation awarded). *See also* LE §§ 9–506, 9–680 (stating circumstances under which compensation is prohibited). In light of the policy favoring liberal construction of the Act, Ankney suggests that the Commission has no authority to terminate an employee's benefits except as *expressly* provided by statute. In *Wildin v. CNA Insur. Co.,* 256 Mont. 354, 846 P.2d 1022 (1993), for example, the Supreme Court of Montana held that an employee's workers' compensation claim was not terminated by an unauthorized settlement. In reaching that conclusion, the court stressed that there was no express statutory authority for the termination of the claim: "If the legislature wanted the insurer to exercise such control over the insured, they would have so stated." *Id.* 846 P.2d at 1024. With respect to Maryland law, there is nothing in the statute

itself to suggest that an unauthorized settlement should be treated differently than a settlement reached with the employer's approval.

For further support, Ankney points to the legislative history of article 101, § 58. The Act "creates a special statutory remedy, and the rights of all persons affected by the proceedings are, so far as they are applicable, measured and limited by the terms of the statute." [6] *Barrett v. Indemnity Ins. Co.*, 152 Md. 253, 259, 136 A. 542 (1927). *See also Hubbard v. Livingston Fire Protection, Inc.*, 289 Md. 581, 589, 426 A.2d 901 (1981); *Baltimore Transit Co. v. Harroll*, 217 Md. 169, 176, 141 A.2d 912 (1958); *Western Maryland Ry. Co.*, 163 Md. at 104, 161 A. 5. With regard to an action brought by the employee against a third party, the critical language of the Act provided:

> [T]he amount thus received by the injured employee ... shall be in lieu of any award that might otherwise have been made thereafter in the same case under the provisions of this article and said case shall thereupon be deemed to have been finally settled and closed *unless the amount thus received by the injured employee or his dependents from such other person shall be less than the injured employee or his dependents would be otherwise entitled to receive under the provisions of this article*, in which event he or his dependents shall have the right to reopen the claim for compensation under this article to recover the difference between the amount thus received by the injured employee or his dependents and the full amount of compensation which would be otherwise payable under this article.

---

**6.** In *Erie Insurance v. Curtis*, 330 Md. 160, 165–69, 623 A.2d 184 (1993), for example, an insurance company attempted to assert a statutory lien against an employee's right to compensation under a policy providing uninsured motorist coverage. The Court of Appeals concluded that Art. 101, § 58, by its express language, was applicable only to third-party claims against tort-feasors. Because the employee's claim sounded in contract rather than tort, the Court held that the insurance company had no interest in the third-party claim.

Art. 101, § 58 (emphasis added). *See also* LE § 9–903.[7] The latter part of this sentence, beginning with the italicized language, was added by amendment in 1957. *See Smith v. Bethlehem Steel Corp.,* 303 Md. 213, 220, 492 A.2d 1286 (1985); *Brocker Mfg. v. Mashburn,* 17 Md.App. 327, 336–37, 301 A.2d 501 (1973). As the commission that proposed the amendment explained:

> The Study Commission believes that the fact that disability or death resulted under circumstances giving rise to an action against a third party tort-feasor, should not operate, *under any circumstances,* to decrease the benefits properly allowable under Article 101.

Second Report of The Commission to Study Maryland's Workmen's Compensation Laws and the Operation of the State Industrial Accident Commission, p. 24 (emphasis added). In *Brocker,* 17 Md.App. 327, 301 A.2d 501, we considered the 1957 amendment in light of the Study Commission's report. We concluded:

> The report of the Study Commission ... makes it vividly clear that the purpose behind the amendment was to prevent an injured employee, who obtains recovery from a negligent third party, from receiving less in *benefits* under

---

**7.** The 1957 amendment has been recodified without substantive change in LE § 9–903, which provides:

   (a) *In general.*—Except as provided in subsection (b) of this section, if a covered employee or the dependents of a covered employee receive an amount in an action:

   (1) the amount is in place of any award that otherwise could be made under this title; and

   (2) the case is finally settled and closed.

   (b) *Exception.*—If the amount of damages received by the covered employee or the dependents of the covered employee is less than the amount that the covered employee would otherwise be entitled to receive under this title, the covered employee or dependents may reopen the claim for compensation to recover the difference between:

   (1) the amount of damages received by the covered employee or dependents; and

   (2) the full amount of compensation that otherwise would be payable under this title.

the Act than he would have been entitled to receive absent a third party claim.

*Id.* 303 Md. at 226, 492 A.2d 1286.

In the case *sub judice,* the Workers' Compensation Commission terminated Ankney's benefits on account without any showing that Aetna had suffered material prejudice. We think that the Commission's decision was plainly inconsistent with the legislative intent underlying the 1957 amendment, as well as the broader statutory goal of providing full compensation for injured employees. We reach that conclusion notwithstanding the result in *Noma Elec. Corp. v. Fidelity & Dep. Co.,* 201 Md. 407, 94 A.2d 277 (1953). There, the Court of Appeals declined to decide whether a subrogee has the burden of showing prejudice. Nonetheless, the court concluded that, "since the principle of suretyship rests upon the variation in risk or undertaking, *it is the loss of a fair chance of recovery,* not an absolute certainty, that constitutes a showing of prejudice." *Id.* 201 Md. at 413–14, 94 A.2d 277 (emphasis added).

In *Bachmann v. Glazer & Glazer,* 316 Md. 405, 413, 559 A.2d 365 (1989), the Court of Appeals noted that subrogation rights may arise by way of contract, statute, or equity. *See also Security Ins. Co. v. Mangan,* 250 Md. 241, 246–48, 242 A.2d 482 (1968). The nature of a party's subrogation rights may be different in each situation, depending on the terms of the pertinent agreement or statute. *South Down Liquors, Inc. v. Hayes,* 323 Md. 4, 10 n. 1, 590 A.2d 161 (1991). Because the result in *Noma Electric* rests on equitable principles of suretyship, the case is not directly applicable in the context of workers' compensation. Unlike the situation in *Noma Electric,* the subrogation rights at issue here arise within the framework of a comprehensive statutory scheme. It is beyond dispute that an employer's subrogation rights may not be exercised in a manner that is inconsistent with the express terms of the Act.[8] We carry that principle one step

8. With regard to third-party claims under the Act, the Court of Appeals has observed:

further and conclude that an employer's subrogation rights may not be enforced in a manner that is plainly inconsistent with the legislative intent.

At the outset of this discussion, we noted that we strive to strike an appropriate balance between the employer's right to subrogation and the employee's right to compensation. The result that we reach must be consistent with the legislative intent and the statutory scheme as a whole. Moreover, we must avoid a construction that is unjust or unreasonable. *Tracey*, 328 Md. at 387–88, 614 A.2d 590; *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177 (1990). In light of the 1957 amendment to the Act, now codified as LE § 9–903, we think it would be both unjust and unreasonable to allow the termination of an employee's claim without a showing that the employer suffered material prejudice. In many cases, a third-party claim may have little more than nuisance value. Under those circumstances, termination of the employee's benefits would bestow an undeserved windfall on the employer. Likewise, it would be manifestly unjust to leave the employer without a remedy in those cases in which material prejudice can be shown. Striking an appropriate balance between the rights of employer and employee requires that we reach a middle ground.

The employee's interest compels our conclusion that an unauthorized third-party settlement does not, in itself, constitute grounds for the termination of the employee's claim. The employer, on the other hand, must have an opportunity to show material prejudice. The burden of proof is on the employer to establish that the *reasonable dollar value* of the third-party claim was greater than the amount of the settle-

---

The right of subrogation in such cases has not been affected by the statute otherwise than to state how it shall be exercised by the employee and the one paying the compensation, and to define their respective interests in any money recovered from the third party....

*Western Maryland Railway*, 163 Md. at 101–02, 161 A. 5 (quoting *State v. Francis*, 151 Md. 147, 134 A. 26 (1926)). That comment was made in 1932, and does not take into account the legislative intent underlying the 1957 amendment.

ment. Since there can only be one recovery for an injury, any other proceeds received on account of the injury, i.e., settlement of malpractice claim against Paavola, would have to be factored into the equation. These sums received by the claimant must be computed as a credit to the employer.

Where prejudice cannot be shown, the proceeds of the unauthorized settlement must be distributed according to the terms of the Act: the employer is entitled to reimbursement from the proceeds; *see* LE § 9–902, and the claim will not be terminated or payment suspended if the sum of the credits to the employer, i.e., the amount of the unauthorized settlement and the settlement against Paavola, is less than the compensation that the employee would otherwise be entitled to receive. LE § 9–903. In a case in which material prejudice is shown, the employer is also entitled to a credit for the amount of the prejudice. The employee's claim may not be abated on account of the prejudice unless the amount of the unauthorized settlement and the settlement against Paavola, *plus* the amount of any prejudice shown, is equal to or greater than the compensation awarded. In the case of a lump-sum payment for a temporary-total or temporary-partial disability, if the credits to the employer exceeded the amount of the lump-sum award, the claim would be abated accordingly. In Ankney's case, future benefits to be received by Ankney pursuant to the Commission's award must be abated where the credits due the employer exceed the amount already received by Ankney, subject to a motion to reopen the case at the point in time when the credits have been exhausted, i.e., the compensation due Ankney equals the proceeds received by her from her unauthorized settlement, her settlement with Paavola, and the amount computed as the prejudice resulting from the unauthorized settlement. The net effect is to shift the loss resulting from an unreasonable or *de minimis* settlement from the employer to the employee.

A hypothetical based on the case before us illustrates these principles. The amount of Ankney's unauthorized settlement with Beerfoot was $6,500. Absent a showing that Aetna

suffered material prejudice, the case would not be treated differently than one involving an authorized settlement, and the consequences of Ankney's settlement would be governed by the terms of LE §§ 9–902 and 9–903. If the Commission found that the reasonable value of Ankney's claim against Beerfoot was $50,000, then the amount of prejudice suffered would be $43,500, and Aetna would be entitled to a credit for that amount as well.[9] Assuming, *arguendo*, Ankney had already received $40,000 in her malpractice claim against Paavola, Aetna would be entitled to a credit of $6,500 [the unauthorized settlement], $43,500 [the prejudice resulting from the unauthorized settlement], and $40,000 [the hypothetical figure assigned to her settlement against Paavola] or a credit in the amount of $90,000. Aetna would still be required to pay Ankney benefits otherwise due whether by way of a lump-sum amount in excess of the $90,000 credited to Aetna or future payments under the Commission's award in excess of $90,000. At the point in time when Ankney would have received benefits equal to the $90,000 credited to Aetna, she would be entitled to have her future benefits resume.

On the other hand, if the amount credited to Aetna was exceeded by a lump-sum award or if the payments to Ankney under the award never became equal to or greater than the credits to which Aetna was entitled, Ankney's benefits would, in effect, be terminated, subject to reopening under LE § 9–736. Ankney's claim would only be closed in the manner described by LE § 9–903 in a case where the credits exceed a lump-sum payment, or, in Ankney's case, actuarially, the future benefits could never exceed the credits due Aetna.

We recognize that our decision here calls for the Workers' Compensation Commission to delve into issues that it heretofore has not been required to resolve. Any result other than

9. The credit would normally be less than the $43,000 because the insurer would usually have deducted "a proportionate share of the attorney's fees, costs, and expenses." *Collins v. United Pacific Ins. Co.,* 315 Md. 141, 151, 553 A.2d 707 (1989). *See also Hubbard v. Livingston Fire Protection Inc.,* 289 Md. 581, 426 A.2d 901 (1981).

our decision herein would be incompatible with the legislative purpose embodied in the Act.

## III

Having resolved the underlying issue of workers' compensation law, we turn our attention to Ankney's claim against Franch for legal malpractice. Following the Commission's decision to terminate Ankney's benefits, the parties discussed the possibility of an appeal to circuit court. Franch requested that Ankney pay an advance of $2,500 toward the cost of an appeal, including the expense of expert medical witnesses. During argument before the trial court, Franch's counsel explained:

> I would agree, [Aetna] would have the burden of showing prejudice. But that's key to our case because that means on appeal you'd had to have doctors in there, and you'd have been litigating, like Paavola, settling the case for a reasonable amount.

In short, Franch contended that Aetna would have the opportunity, in circuit court, to litigate fully the value of Ankney's claim against Beerfoot. We disagree.

When a party appeals a decision rendered by the Commission, the scope of review in circuit court is narrow. *See* LE § 9–737 (providing for an appeal "in accordance with Subtitle B of the Maryland Rules"). *See also* art. 101, § 56 (providing that the Commission's decision shall be affirmed on appeal if "the Commission has acted within its powers and has correctly construed the law and facts"). The Court of Appeals has previously noted that an issue of fact not raised before the Commission may not be raised for the first time on appeal. *Cabell Concrete Block Co. v. Yarborough,* 192 Md. 360, 369, 64 A.2d 292 (1949) ("As the Commission is the original fact-finding body, an issue of fact must originate with the Commission . . ."). Even in cases where the appeal is argued *de novo* before a jury, the parties may not raise new factual issues in circuit court. *See Benoni v. Bethlehem–Fairfield Shipyard,* 188 Md. 306, 308–09, 52 A.2d 613, *appeal dismissed,* 332 U.S.

749, 68 S.Ct. 86, 92 L.Ed. 336 (1947) (addressing the scope of an appeal under art. 101, § 56). *See also Esslinger v. Baltimore City,* 95 Md.App. 607, 623, 622 A.2d 774, *cert. denied,* 331 Md. 479, 628 A.2d 1066 (1993) (reaching a similar conclusion regarding the scope of administrative appeals pursuant to Subtitle B of the Maryland Rules).

An appeal from the termination of Ankney's claim was likewise limited to the law and facts that were litigated before the Commission. Under the circumstances, an appeal to the circuit court would have been limited to a single question:

Did the Commission err, as a matter of law, by terminating Ankney's compensation from the date of the unauthorized settlement?

If the circuit court answered "yes," then the Commission would be required to entertain Ankney's claim. If the court concluded that Aetna must show prejudice, the issue of prejudice could not have been litigated in circuit court. Thus, Ankney's experts were correct when they concluded that an appeal could have been decided on summary judgment, without the need for expert witnesses. Finally, we observe that if the outcome in circuit court was not favorable, Ankney could have noted an appeal to this Court without further delay.

## IV

Both of Ankney's expert witnesses testified that the Workers' Compensation Commission erred by terminating Ankney's claim solely on the basis of the unauthorized third-party settlement. After concluding that the experts were wrong, the trial court struck their entire testimony. Ankney contends that the trial court erred as a matter of law in granting the motion to strike. She also contends that the judge abused his discretion. Our ruling on those questions requires that we briefly consider the role of expert testimony in a claim for legal malpractice.

The gravamen of a complaint for attorney malpractice is "the negligent breach of a contractual [and professional] duty." *Flaherty v. Weinberg,* 303 Md. 116, 134, 492 A.2d 618

(1985). *See also Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 335, 624 A.2d 496 (1993). An attorney's professional obligations include, *inter alia,* the duty to exercise reasonable care in advising his or her client about the merits of a claim. *See, e.g.,* MD.RULES OF PROFESSIONAL CONDUCT, Rule 1.4(b) (stating that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). *See also Flaherty,* 303 Md. at 134–35, 492 A.2d 618 (discussing negligent misrepresentation in the context of attorney malpractice).

As a general rule, expert testimony is required to establish legal malpractice, except in those cases in which the "common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts." *Central Cab Co. v. Clarke,* 259 Md. 542, 551–52, 270 A.2d 662 (1970); *Fishow v. Simpson,* 55 Md.App. 312, 318–19, 462 A.2d 540 (1983). Ankney's malpractice claim rests on her assertion that Franch was negligent in advising her about the merits of an appeal. In that regard, expert testimony was indispensable to establish what conclusions a reasonably competent workers' compensation attorney would have reached under all the facts and circumstances, including the state of Maryland law at the time of the representation.

In her brief, Ankney asserts that the testimony of expert witnesses was not essential to her case. In her view, the jury could have concluded, from their "common knowledge or experience," that Franch was negligent in advising Ankney about the merits of an appeal. Although we conclude that the termination of Ankney's benefits was erroneous as a matter of law, we do not agree that Ankney could establish a *prima facie* case of negligence without the benefit of expert witnesses. The central issue in Ankney's malpractice claim was not whether Franch's advice and conclusions were *legally correct,* but whether they were *reasonable.* Prior to our decision here, Maryland law on the relevant point was very much unsettled, and decisions in other jurisdictions offered no

clear guidance. Whether Franch's advice was reasonable must be assessed against the backdrop of that uncertainty.

■■■■■ The admissibility of expert testimony is an area in which the trial court is given broad discretion, and it rarely constitutes grounds for reversal. *Simmons v. State,* 313 Md. 33, 43, 542 A.2d 1258 (1988). The trial judge has broad power to strike the testimony of expert witnesses, particularly when that testimony is grounded in "mere conjecture or guess." *Hartless v. State,* 327 Md. 558, 578–79, 611 A.2d 581 (1992); *State Department of Health v. Walker,* 238 Md. 512, 520, 209 A.2d 555 (1965). The trial court's decision to reject such evidence may be reversed if it is founded on an error of law, or if the trial court clearly abused its discretion. *Radman v. Harold,* 279 Md. 167, 176, 367 A.2d 472 (1977); *Raithel v. State,* 280 Md. 291, 301–02, 372 A.2d 1069 (1977).

■■■ As we explained in *Melrod v. Melrod,* 83 Md.App. 180, 574 A.2d 1, *cert. denied,* 321 Md. 67, 580 A.2d 1077 (1990), the trial court may not exercise its discretion in a manner that is unduly prejudicial to a litigant. In *Melrod,* the trial court excluded Mrs. Melrod's expert witness, thereby creating a situation in which the court, as trier of fact, heard only the opinion evidence of one party's expert witness, with no expert testimony supporting the other side. On appeal, we recognized that "the basic unfairness of that situation was an additional factor to be weighed by the [trial] court," *id.* at 193, 574 A.2d 1, and concluded that the court abused its discretion. The Court of Appeals had reached a similar result in *Marder v. Mayor & City Council of Baltimore,* 232 Md. 299, 303–04, 192 A.2d 512 (1963).

■■■ In the case *sub judice,* the depositions of both experts were taken prior to trial, and Franch prepared a pre-trial memorandum arguing that their testimony should be excluded. Arnold testified before Dubois, and Franch promptly moved to strike Arnold's testimony. We think the court's ruling was unduly prejudicial. As in *Melrod,* the "basic unfairness" of the situation constituted a clear abuse of discre-

tion. Accordingly, the judgment of the circuit court must be reversed.

Upon retrial, the threshold issue that must be adjudicated is whether, given the state of the law when Franch advised Ankney that her appeal would not succeed, his advice was reasonable and in accord with the standards of the legal profession. Upon a finding that Franch acted in accordance with accepted standards of reasonableness in the legal profession, any necessity to conduct further inquiry into the harm Ankney may have suffered would thereby be obviated. Upon a finding that Franch's advice, in light of the law available to him at the time, was not reasonable, the burden then shifts to Ankney to show the resultant loss she suffered by reason of Franch's counsel that she would not succeed on appeal. Stated otherwise, she must prove the amount of the award she would have expected to receive had her case been heard by the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**