*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TRACY O. ATKINS, | ) | |
| | ) | Supreme Court No. S-16485 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 14-011 |
| | ) | |
| INLET TRANSPORTATION & TAXI | ) | O P I N I O N |
| SERVICE, INC. and STATE OF | ) | |
| ALASKA, WORKERS' | ) | |
| COMPENSATION BENEFITS | ) | |
| GUARANTY FUND, | ) | No. 7300 - September 21, 2018 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Eric Croft, The Croft Law Office, Anchorage, for Appellant. Siobhan McIntyre, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska, Workers' Compensation Benefits Guaranty Fund. No appearance by Inlet Transportation & Taxi Service, Inc.

Before: Stowers, Chief Justice, Winfree, Bolger, and Carney, Justices. [Maassen, Justice, not participating.]

STOWERS, Chief Justice.

## I.     INTRODUCTION

A taxi driver was injured in a car accident while working. The taxi driver

later filed a report of injury with the Alaska Workers' Compensation Board, but the nature of the employment relationship between the taxi company and the driver was disputed. The taxi driver retained an attorney for a tort suit against the other driver, settling that claim with the driver's insurance company without the taxi company's approval. Because the taxi company did not have workers' compensation insurance, the Alaska Workers' Compensation Benefits Guaranty Fund (the Fund) assumed responsibility for adjusting the workers' compensation claim. The Fund asked the Board to dismiss the taxi driver's claim because of the unapproved settlement. The Board dismissed the claim, and the Alaska Workers' Compensation Appeals Commission ultimately affirmed the Board's decision. The taxi driver appeals, advancing both legal and equitable arguments. We affirm the Commission's decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Tracy Atkins began driving for Inlet Transportation & Taxi Service, Inc.[1] (Inlet Taxi) in the Kenai area in the summer of 2009. Shortly after midnight on September 6, 2009, Atkins was en route to pick up his last fare of the night when another car crossed the center line of the Kenai Spur Highway and hit his taxi head on. The other driver, 19-year-old Jeffrey Vincent, died in the collision; Atkins was severely injured.

---

[1] The identity of Atkins's employer is unclear, with two business entities identified in the record. Acting at the Fund's request, the Board did not determine whether Atkins, as a taxi driver, was an employee under the Alaska Workers' Compensation Act and, if he was, who his employer was. *See* AS 23.30.230(a)(7) (exempting from coverage taxi drivers with certain written contractual arrangements). We refer to all the potential employer entities as Inlet Taxi unless the context requires otherwise.

Atkins's employment relationship with Inlet Taxi has been disputed, and the record about this relationship was not well developed because of the order in which the Board decided to consider the issues. Atkins testified that Michael Kinslow hired him to work for Inlet Taxi; Atkins understood that Kinslow was buying the company and was acting as the manager for the owner, Robert Roper. Kinslow in fact was not purchasing the business, but at the time Atkins was driving the cab, Kinslow had a business license to operate a business called Inlet Taxi & Transportation. According to records from the State of Alaska Division of Corporations, Business and Professional Licensing, Inlet Transportation & Taxi Service, Inc. was a corporation wholly owned by Roper at the time of the accident. Nothing in the record shows that Atkins had a written contract with Roper, Kinslow, or Inlet Taxi, even though the Board ordered the corporation to produce a written contract if one existed. Atkins testified that while he was hospitalized following the accident, Kinslow asked him to sign a contract at Roper's behest. Atkins refused to sign it.

Several months after the accident, Atkins contacted Joseph Kalamarides, an attorney experienced in representing workers' compensation claimants, to see whether his injuries might be covered by the Alaska Workers' Compensation Act (Act). Kalamarides declined to represent Atkins but wrote an opinion letter setting out statutory subsections relevant to taxi drivers.[2] Kalamarides noted that it appeared Atkins did not have a written contract and told Atkins that if he filed a workers' compensation claim, he "[might] need to know that any resolution with the liability carriers in the accident ha[d] to be done with the written agreement of the workers' compensation carrier as they

_____

[2]        AS 23.30.230(a)(7) generally exempts from coverage under the Act taxi drivers "whose compensation and written contractual arrangement is as described in AS 23.10.055(a)(13)."

may have a lien on those proceeds."[3] Kalamarides directed Atkins to the Board for further information if Atkins wanted to pursue a workers' compensation claim. Atkins later contacted the Division of Workers' Compensation to see whether Inlet Taxi had workers' compensation insurance; according to the Division's database, it was uninsured.

Atkins retained an attorney, Stuart Cam Rader, to represent him in his personal injury claims. Rader later testified that he advised Atkins to "follow through on" "any means of redress that would put money in his pocket quickly," including workers' compensation. Rader said he did not practice workers' compensation law except for a small amount "15 or 20 years ago" but was aware that "an employer has a comp lien" on proceeds from a negligence action against a third party; he was not, however, aware of the specific statutory provision related to employer approval of third-party settlements. Rader attempted to contact Roper, Inlet Taxi, and "the person that purchased Inlet" to inform them of his representation of Atkins and "to find out about their insurance coverage." Rader did not recall talking to anyone at Inlet Taxi until he "was able to make a connection with an adjuster for National Continental Insurance," Roper's commercial liability insurer. The adjuster requested that Rader "recover whatever [he] could from the at-fault parties . . . so that . . . [the adjuster] could properly address the underinsured's liability under Inlet Taxi's policy." Rader obtained a policy-limits settlement against the estate's automobile insurance policies,[4] and Atkins signed

---

[3]     AS 23.30.015(h) provides, "If compromise with a third person is made by the person entitled to compensation . . . of an amount less than the compensation to which the person . . . would be entitled, the employer is liable for compensation . . . only if the compromise is made with the employer's written approval."

[4]     Vincent was driving a parent's car at the time of the accident, so Atkins received a policy-limits payment from two policies, one from Vincent's policy and
(continued...)

releases related to the estate's insurance on May 5, 2011. Each policy paid $50,000 plus prejudgment interest and Alaska Civil Rule 82 attorney's fees. After Rader provided Roper's insurer's adjuster with copies of the releases, the commercial liability carrier settled Atkins's underinsured motorist claim. Although Rader was not entirely sure, he thought he "was aware [Atkins] was pursuing a comp remedy before . . . settl[ing] with the [estate]." Nothing in the record indicates that Rader obtained written approval from Roper or Inlet Taxi for the settlement with the Vincent estate.

## B.    Proceedings

When Atkins contacted the Division to inquire whether Inlet Taxi had compensation coverage, a Division employee urged him to file a claim with the Board. Atkins filed a Report of Injury in early April 2011, noting that Inlet Taxi was uninsured. He filed a written workers' compensation claim for a variety of benefits the same day. His claim identified Inlet Taxi & Transportation as his employer and asked the Board to join the Fund. The Fund, established in 2005,[5] can provide compensation benefits to injured workers in some circumstances.[6] An employee whose employer (1) has no compensation coverage and (2) "fails to pay compensation and benefits due to the employee under [the Act]" can "file a claim for payment by the [F]und."[7] "The [F]und may assert the same defenses as an insured employer under [the Act]."[8]

---

[4]    (...continued)
another from the parent's policy.

[5]    Ch. 10, § 31, FSSLA 2005.

[6]    AS 23.30.082.

[7]    AS 23.30.082(c).

[8]    *Id.*

The Board sent notice of the claim to Inlet Taxi; it did not answer.[9]  The Fund filed an answer to Atkins's claim, disputing the existence of an employment relationship.  The Fund filed its first notice of controversion in May 2011, disputing whether Atkins was covered by the Act because he was a taxi driver.  The Fund also petitioned to join the corporate officers of Inlet Transportation & Taxi Services, Inc.[10] and Michael Kinslow d/b/a Inlet Taxi & Transportation Services.

On May 16 the Fund's adjuster, Joanne Pride, interviewed Atkins.  Atkins told her the circumstances of the accident and his employment with Inlet Taxi, and gave her information about his work history.  Atkins shared letters from Kalamarides and the estate's insurance adjuster with Pride.  Atkins told Pride he was being represented by Rader and that they were "working on" a settlement with the estate, saying, "Have no monies as of yet but working on it."  Atkins informed Pride that the settlement would be for policy limits and would total $100,000 before attorney's fees and liens were taken out.  He confirmed that his medical expenses exceeded the amount of the settlement.  Atkins did not advise Pride that he had signed the two automobile insurance releases 11 days earlier.  Pride did not tell Atkins he might need to get written approval from either his employer or the Fund for any settlement with the estate.

The Board joined Kinslow and all corporate officers of Inlet Transportation & Taxi Service, Inc.  The only employer entity who answered the claim was Kinslow; in an untimely answer he asked to be dismissed from the case, which the Board refused to do.  The record indicates that Brian Altman, the vice-president of the corporation, contacted the Board to say he "would have no participation in the case" because "Atkins

---

[9]      Many notices sent to Inlet Taxi were returned to the Board.

[10]      By the time Atkins filed his workers' compensation claim, the corporation was jointly owned by Roper and Brian Altman; Roper, Altman, and Jay Edelman were its officers.

was not an employee of the corporation." In October 2011, the Fund filed a second notice of controversion based on Atkins's settlement with the estate.

Atkins filed an affidavit of readiness for hearing in October 2013, two years after the Fund's second notice of controversion. The Fund then petitioned the Board to dismiss Atkins's workers' compensation claim on two grounds: (1) he did not get written permission from the employer prior to settling with the estate and (2) he did not timely file an affidavit of readiness for hearing because he did not file it within two years of the first notice of controversion.

The Board scheduled a hearing on the petition to dismiss. Atkins, who was self-represented, emailed the Board shortly before the hearing to complain that the parties had not yet determined whether he even had a workers' compensation case. He renewed his objection at the hearing, arguing that if Inlet Taxi was not his employer under the Act, there was no reason for the parties to have a hearing. The Fund asserted the employment question was "more complicated" and asked the Board to dispose of the case on other grounds. The Fund's position was that Atkins's medical bills from the accident exceeded the total settlement with the estate, so Atkins's failure to obtain written approval of that settlement from his employer or the Fund was an adequate legal basis on which to dismiss the claim.[11]

At the hearing the Board chair initially questioned the Fund's attorney about the order in which the issues were being presented for decision, noting "two big preliminary issues" that were disputed, one being "Was Mr. Atkins an employee for purposes of the Act?" and the other being "Was he exempt from the Act as a taxi driver?" The Fund refused to concede Atkins was an employee for purposes of the Act

---

[11] The payment from Roper's insurance was not at issue because Roper was not a third person under AS 23.30.015.

but asked the Board to go forward with the hearing assuming Atkins was an employee of some employer.[12] The Board agreed to hear the issues in the order the Fund wanted them heard after determining the parties agreed that Atkins's medical bills (compensation the Fund might be liable for) exceeded the amount of the settlement with the estate.

Pride testified about the controversions she filed and about the interview she conducted with Atkins in May 2011, indicating Atkins had informed her of the amount of his medical bills and the settlement negotiations with the estate's insurer. Pride testified that Atkins told her a settlement was "in the works" but did not say he had already signed releases for the estate's insurance, and when she contacted other insurance companies in October 2011, "[t]hey were very taken aback, because they were not aware that workers' comp was involved in this, or they would never have settled the claim."[13] Pride calculated the amount of Atkins's benefits, estimating his weekly disability benefit would be $362.

Rader did not recall when he found out Atkins had filed a workers' compensation claim and could not recall whether he had referred Atkins to Kalamarides, but he remembered telling Atkins that Atkins "should follow through on" other "means of redress."[14] Rader testified that he attempted more than once — though he was not sure how many times — to contact Inlet Taxi or a representative of that company and that he was aware that the employer might have "a comp lien" on settlement proceeds. The only

---

[12] No one questioned Atkins's employment status on appeal, so we also assume he was an employee for purposes of the Act.

[13] No one clarified which insurers she talked to. The Board made no findings about this, and the Commission inferred she had talked to the estate's automobile liability insurer.

[14] Rader was in the hospital when he testified and presumably did not have his file with him.

person connected to Inlet Taxi that Rader heard from was the adjuster for National Continental Insurance. Rader's understanding was that National Continental had issued a commercial liability policy with Roper as the insured, but he thought the policy had the name of a business entity as well. Rader admitted he was unaware of the specific statutory subsection requiring the employer's written approval of a settlement with a third party. He indicated that the adjuster asked him to obtain a policy-limits settlement from the estate so the adjuster could address underinsured motorist coverage.

Altman, testifying as a witness for the Fund, said he had been an officer of Inlet Transportation & Taxi Service, Inc. (which was no longer in business by the time of the hearing) beginning in 2008. He was a driver, but Roper asked him to join "the management team and made [him] vice-president of the corporation." According to Altman, Roper was "senile" and had not had a driver's license for some time. Altman testified that Kinslow had expressed an interest in buying the company, but Altman thought Kinslow had taken advantage of Roper because when Altman returned from a "hiatus" "Roper felt he had no control of the company." Altman said he had never met Atkins and that Atkins's attorney had not contacted him. Altman was aware of Atkins's accident because Altman was "the liaison to the Alaska State Troopers to retrieve any property" belonging to Inlet Taxi.

At the start of his own testimony, Atkins again objected to the order of proceeding. He then testified about his contacts with the Board and the steps he took to file his claim. He disclaimed any "malicious" intent in the sequence of events and explained his delay in filing a workers' compensation claim by saying he was overwhelmed with the extent of his injuries.

The Board dismissed Atkins's claim because he had not obtained the written approval of the Fund or Inlet Taxi before settling with the estate. The Board observed that the Fund could assert the same defenses as insured employers and that

AS 23.30.082(c) had "long been construed to apply also to uninsured employers." The Board said the language of AS 23.30.015(h) was "clear and unequivocal." The Board declined to decide the Fund's request to dismiss for failure to file a timely hearing request because there was "no need" to do so.

Atkins appealed to the Commission. While the appeal was pending, Atkins obtained representation in his workers' compensation case. Atkins asserted in his brief before the Commission that Inlet Taxi was aware of or consented to the settlement with the estate. He argued that Inlet Taxi should not be allowed to avail itself of the employer-approval defense to payment because of its refusal to participate in the Board proceedings or to communicate with Rader when Rader attempted to contact it. Atkins argued his policy-limits settlement without Inlet Taxi's written approval was not prejudicial to the employer and contended that equitable principles barred application of the employer-approval provision to the case because "the insurance carrier for . . . Inlet Taxi had actual knowledge of the attempts to settle insurance claims" by virtue of the adjuster's contact with Rader. He raised a substantial compliance argument, arguing that the purpose of the written-approval requirement was fulfilled in his case because his policy-limits settlement with the estate gave Inlet Taxi all it could have gotten from the claim. He asked the Commission to reverse the Board's decision and remand the case to the Board so that the Board could determine his eligibility for benefits.

The Commission issued a short decision remanding the case to the Board for factual findings related to Atkins's equitable defenses and for consideration of the Fund's argument that Atkins had not asked for a hearing by the statutory deadline.[15] The Commission stated it could not "rule on Mr. Atkins'[s] equitable argument, or on the

---

[15] *See* AS 23.30.110(c) ("If the employer controverts a claim on a board-prescribed controversion notice and the employee does not request a hearing within two years following the filing of the controversion notice, the claim is denied.").

argument that Inlet Transportation was not prejudiced by the settlement, in the absence of pertinent factual findings." In its discussion of the need for remand, the Commission first noted testimony from Rader that he had tried to contact Inlet Taxi but had gotten no response, which it considered relevant to an estoppel argument. It also noted testimony that Roper's "commercial insurance carrier was aware of the third party settlement," which it considered relevant to whether Inlet Taxi had notice of the settlement. The Commission also observed that Atkins's argument about excusing the lack of employer approval "need not be considered at all, if his claim [was] otherwise barred" because Atkins did not timely request a hearing. The Commission retained jurisdiction, remanded to the Board for further proceedings and factual findings, and said it would consider the arguments raised on appeal "after completion of the further proceedings and findings in compliance with [the] order."

The Board held a second hearing in 2015 at which it heard testimony from a Division employee related to her advice to Atkins about his deadline for requesting a hearing. Atkins called two witnesses to show that the estate had negligible assets aside from insurance; Atkins also testified again.

In its second decision, the Board decided the claim should be dismissed because Atkins had not filed an affidavit of readiness for hearing within two years of the first controversion. The Board thought the May 2011 controversion based on Atkins's occupation as a taxi driver was a good-faith controversion, and it decided that because Atkins did not request a hearing within two years of the May 2011 controversion, his claim should be dismissed. The Board made some further factual findings, but they did not pertain to the settlement or prejudice to the employer. The Board did not discuss the equitable issues and "denied as moot" the Fund's petition to dismiss under the employer-approval requirement in light of the dismissal on other grounds.

Atkins again appealed. The Commission reversed the Board's decision

about the timeliness of Atkins's hearing request because the Commission determined the May 2011 controversion was not in good faith and, under earlier Commission decisions, a bad-faith controversion cannot start the limitations period to request a hearing.[16]

The Commission then decided that Atkins's claim had been properly dismissed under the employer-approval provision in AS 23.30.015(h). It decided first that AS 23.30.015(h) applied to uninsured employers. The Commission then decided that Inlet Taxi's failure to file an answer could not serve as basis for waiver of its employer-approval defense. It also assumed that an employer could be estopped from asserting such a defense and "that the failure to respond at all to a request for written consent would be sufficient to avoid application" of that defense "under an equitable theory." But it decided that because Rader was unaware of the specific statutory requirement of written approval, "his attempt to contact Inlet Taxi could not have been an effort to obtain its written consent" and thus no causal relationship existed to support estoppel. The Commission decided Atkins had not substantially complied with the statute and that the statutory penalty applied even in the absence of actual prejudice to the employer. The Commission then decided "that, when an employee notifies an employer of the intent to compromise a third party claim and requests its approval of the settlement, the employer may withhold its approval only if it does so in good faith." Because of this requirement, the Commission saw no reason "that the term 'persons entitled to compensation' in AS 23.30.015(h) must be construed as limited to persons for whom the employer has accepted liability or to whom it has made compensation payments." The Commission did not deem it necessary to address bad faith in Atkins's case.

Atkins appeals.

---

[16] The Fund did not appeal this part of the decision.

## III.  STANDARD OF REVIEW

In a workers' compensation appeal from the Commission, we review the Commission's decision rather than the Board's.[17]  "Interpretation of a statute is a question of law to which we apply our independent judgment, interpreting a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[18]

## IV.  DISCUSSION

Alaska Statute 23.30.015 governs the interaction between the parties to a compensation case and third parties who are responsible in whole or in part for a worker's injuries.  It provides in pertinent part:

> (a) If on account of disability . . . for which compensation is payable under this chapter the person entitled to the compensation believes that a third person other than the employer or a fellow employee is liable for damages, the person need not elect whether to receive compensation or to recover damages from the third person.

> (b) Acceptance of compensation under an award in a compensation order filed by the board operates as an assignment to the employer of all rights of the person entitled to compensation . . . to recover damages from the third person unless the person . . . entitled to compensation commences an action against the third person within one year after an award.

> . . . .

> (f) Even if an employee . . . or the employer brings an action or settles a claim against the third person, the employer shall pay the benefits and compensation required by this chapter.

---

[17]    *Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 912 (Alaska 2016).

[18]    *Id.* (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

. . . .

> (h) If compromise with a third person is made by the person entitled to compensation . . . of an amount less than the compensation to which the person . . . would be entitled, the employer is liable for compensation stated in (f) of this section only if the compromise is made with the employer's written approval.

Here, the Fund rather than the employer participated in the proceedings and raised defenses available to an employer under AS 23.30.015(h).[19]

## A. The Release Was A Compromise Subject To AS 23.30.015(h).

Atkins argues first that his release of the estate for policy limits was not a compromise under AS 23.30.015(h) because the amount of his recovery was set by an independent source — the limits of the insurance policies — rather than negotiations between the parties. He contends that not all settlements or agreements are compromises, citing various definitions of these words as well as general principles of statutory construction to support his argument. The Fund responds that the statutory language is clear and that the releases were compromises because Atkins gave something up — the right to receive more in damages from the estate — to get something — the policy limits of the insurance policies. The Fund disputes the distinctions Atkins attempts to make between the terms *settlement*, *agreement*, and *compromise*, three terms the Act uses in different contexts. In reply Atkins reiterates that the terms have different meanings and points out that the only time the Act uses the term *compromise* is in AS 23.30.015.

We construe a statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its

---

[19] *See* AS 23.30.082(c) (permitting the Fund to raise defenses available to insured employers).

-14-                                                                7300

purpose.[20]  Here, no legislative history is readily available because AS 23.30.015(h) has been part of the Act since 1959 and has undergone only slight changes in wording since that time.[21]

The word *compromise* is not defined in the Act,[22] so we construe the word according to any technical meaning it has acquired.[23]  The more relevant definition of *compromise* in Black's Law Dictionary is "[a]n agreement between two or more persons to settle matters in dispute between them; an agreement for the settlement of a real or supposed claim in which each party surrenders something in concession to the other."[24] The agreement between the estate (through its insurer) and Atkins meets this definition.

Both releases signed by Atkins contain this phrase:  "It is understood and agreed that this settlement is in full compromise of a . . . disputed claim . . . ."  Atkins and the estate had a dispute about liability for the car wreck and damages related to it.  The estate gave up something ($100,000 plus prejudgment interest and attorney's fees) and in return got a release of further liability.  Atkins surrendered any right to damages above policy limits and got the money, minus attorney's fees and costs.  Atkins contends that he was "not 'compromising' because an outside entity or limit force[d] the amount of the

---

[20]  *Louie*, 327 P.3d at 206.

[21]  *See* ch. 193, § 30(7), SLA 1959; *see also* ch. 73, § 1, SLA 1965.

[22]  *See* AS 23.30.395.

[23]  *See* AS 01.10.040(a) ("Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.").

[24]  *Compromise*, BLACK'S LAW DICTIONARY (10th ed. 2014).   A general dictionary definition is essentially the same:  "A settlement of differences in which each side makes concessions."  *Compromise*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005).

settlement," but no one forced the amount of the settlement. Nothing in the record shows that Rader was prevented from filing suit against the estate and obtaining a larger judgment. The end result of a judgment against the estate may have been the same as the settlement because the estate had virtually no other assets, but the settlement was nonetheless a compromise.

**B.     Lack Of Prejudice To Inlet Taxi Did Not In Itself Excuse The Failure To Get Written Approval.**

Atkins's principal argument is that his claim should not be forfeited because his failure to get Inlet Taxi's written approval of his settlement with the estate did not prejudice Inlet Taxi. He contends that preventing prejudice to the employer from settling a claim for too little is the purpose of the written-approval requirement and that in his case a settlement for policy limits was the most anyone could get. He concludes that he should be excused from failing to get Inlet Taxi's written approval. He relies on federal cases, two of our prior cases, and some out-of-state cases to support his argument. The Fund distinguishes the cases Atkins relies on and argues that substantial evidence supports the denial of benefits.

Our case law applying AS 23.30.015(h) does not suggest that lack of prejudice to an employer is alone sufficient to excuse failure to get employer approval of a third-party settlement. In *State, Department of Fish & Game v. Kacyon* we held that AS 23.30.015(h) did not apply because we determined that under the facts of that case the third-party compromise exceeded the collective amount of the workers' compensation benefits to both beneficiaries of a worker's estate.[25]

Nor does *Forest v. Safeway Stores, Inc.* hold that prejudice alone can

---

[25]     31 P.3d 1276, 1283 (Alaska 2001).

relieve a worker from complying with AS 23.30.015(h).[26]  There an injured worker stipulated to dismiss a malpractice action against a physician whose treatment of the worker for a work-related injury allegedly aggravated that condition.[27]  Following the dismissal the employer asked the Board to terminate all workers' compensation benefits because the worker had not obtained the employer's permission to dismiss the case.[28]  We identified the purpose of AS 23.30.015 as "allow[ing] employees to seek damages from third-party tortfeasors without jeopardizing their compensation while, at the same time, allowing employers to share in damage awards up to the limit of their exposure under the workers' compensation law."[29]  We differentiated between benefits related to the original injury and those related to the "negligent aggravation, if any, of the original work-related injury."[30]  We decided that the compromise only affected benefits related to the aggravation, not the original injury, and that the employer's obligation to provide compensation for the initial injury remained unchanged because that obligation was unaffected by the settlement.[31]  We wrote that to construe the statute as the employer proposed "would result in a windfall for the employer" and would be "a particularly harsh penalty for an injured worker who would end up paying for what [was]

---

[26]     830 P.2d 778 (Alaska 1992).

[27]     *Id.* at 779.

[28]     *Id.* at 780.

[29]     *Id.* at 781.

[30]     *Id.* at 782.

[31]     *Id.*

undoubtedly an attorney's blunder."[32] We held in *Forest* that compensation for any part of the disability attributed to the alleged aggravation would be barred by the unauthorized dismissal.[33]

Atkins also argues that "when there is no prejudice to the employer because the settlement amount was set by something other than negotiation or compromise," federal cases have not barred claims under a provision in the Longshore and Harbor Workers' Compensation Act (LHWCA) similar to AS 23.30.015(h).[34] He maintains the amount of the settlement with the estate was set by an outside force — the policy limits of the insurance policy — so lack of prejudice to Inlet Taxi is sufficient to relieve him of the statutory requirement of getting Inlet Taxi's written approval.

The federal cases Atkins relies on are distinguishable because in both instances there was a trial before the settlement. In *Bell v. O'Hearne* the decedent's parents won a jury verdict of $6,500 against a third party but settled without the employer's approval for $5,000 while the third-party case was on appeal.[35] The decedent's parents agreed the employer could get a credit for the full amount of the jury verdict, so in the case between the decedent's parents and the employer, the court decided the purposes of the employer-approval statute had been fulfilled because "there

---

[32]     *Id.*

[33]     *See id.* (holding that the Board should have dismissed that part of the employee's claim "attributable to the physician's negligence").

[34]     Alaska's Act is modeled on the LHWCA, *McCarter v. Alaska Nat'l Ins. Co.*, 883 P.2d 986, 990 n.5 (Alaska 1994), but because of statutory amendments, the subsection corresponding to AS 23.30.015(h) is no longer similar. *Compare* 33 U.S.C. § 933(g) (2012), *with* AS 23.30.015(h).

[35]     284 F.2d 777, 778 (4th Cir. 1960).

ha[d] been a *judicial* determination of the damages" and no prejudice to the employer.[36]

*Banks v. Chicago Grain Trimmers Ass'n* also involved a post-trial settlement.[37] After a widow obtained a $30,000 verdict against a third party from a jury, the trial judge told her he would grant the third party's motion for a new trial unless she agreed to a remittitur of $11,000.[38] When she did so without getting the employer's approval, the employer later contested her eligibility for LHWCA benefits.[39] The U.S. Supreme Court, considering the New York law on which the LHWCA was modeled, held that remittitur was not a compromise but "a *judicial* determination of recoverable damages."[40] The court then said the purpose of the compromise provision was to "protect[] the employer against [the] employee's accepting too little for his cause of action against the third party" and this "danger is not present when damages are determined, not by negotiations between the employee and a third party, but rather *by the independent evaluation of a trial judge.*"[41]

In Atkins's case the settlement amount was not based on a judicial assessment of his claim, and we are not persuaded that the rule can be extended to cover compromises reached before a lawsuit is even filed. It is uncontested that Atkins's damages far exceeded the estate's policy limits — his medical bills alone exceeded $160,000. While the policy concern about "accepting too little for [the] cause of action"

---

[36]     *Id.* at 780 (emphasis added).

[37]     390 U.S. 459 (1968).

[38]     *Id.* at 461.

[39]     *Id.* at 461, 466-67.

[40]     *Id.* at 467 (emphasis added).

[41]     *Id.* (emphasis added).

may seem less important here because the estate had so few assets, nothing in the record indicates that Rader knew about the estate's value before the settlement or told any of the other insurers about a potential workers' compensation claim.[42]

Assuming as we do that Atkins was an employee under the Act, we acknowledge that Atkins bears a "particularly harsh penalty . . . for what [was] undoubtedly an attorney's blunder"[43] in not discovering the nature of the "comp lien" Inlet Taxi had. Rader evidently did not consult the Alaska Statutes to understand the interface between the rights of employers and employees in third-party settlements in workers' compensation case law.[44] Rader's actions are particularly troublesome because he advised Atkins to pursue "any means of redress that would put money in his pocket quickly," including workers' compensation. Nonetheless, the statute requires employer approval, and neither Rader nor Atkins obtained the approval of Inlet Taxi before settling

---

[42]       The out-of-state cases Atkins cites to support his argument about prejudice to the employer are not persuasive because all of those states' statutory provisions differ significantly from AS 23.30.015(h). New York's statute allows for a type of judicial bypass when an employer does not consent to a third-party settlement; that provision was used in the cases Atkins relies on. *Fid. & Guar. Ins. Co. v. DiGiacomo*, 3 N.Y.S.3d 384, 387-88 (N.Y. App. Div. 2015) (citing N.Y. Workers' Comp. Law § 29(5)); *Lindberg v. Ross*, 964 N.Y.S.2d 677, 678 (N.Y. App. 2013). Arizona's statute did not have a specific penalty for failure to obtain employer approval. *Bohn v. Indus. Comm'n of Ariz.*, 999 P.2d 180, 181-82 (Ariz. 2000) (en banc) (citing former Ariz. Rev. Stat. § 23-103(C)). In contrast, AS 23.30.015(h) makes employer approval of a third-party settlement a prerequisite to continuing benefits. And Maryland's statute has no provision similar to AS 23.30.015(h). *See Ankney v. Franch*, 652 A.2d 1138, 1149, 1151 (Md. Spec. App. 1995), *rev'd on other grounds*, 670 A.2d 951 (Md. 1996).

[43]       *See Forest v. Safeway Stores, Inc.*, 830 P.2d 778, 782 (Alaska 1992).

[44]       Like the Fund, we do not doubt Atkins's truthfulness in his interactions with the Fund's adjuster.

with the estate. The statutory penalty for not getting employer approval, while harsh, is clear.

C.    **The Commission Did Not Err In Deciding That Atkins Did Not Substantially Comply With AS 23.30.015(h).**

Atkins argues that he substantially complied with AS 23.30.015(h) because Rader "attempted to communicate with Inlet Taxi in order to satisfy any lien it had" and then "followed the direction of the insurance carrier for Inlet Taxi to get policy limits settlements thereby allowing payment under Inlet Taxi's underinsured policy." He also contends that the Commission "erred by failing to consider the fact that Inlet Taxi was willfully avoiding participation and the fact that Inlet Taxi's insurance carrier directed Mr. Rader to make the policy limits settlements." The Fund does not contest that substantial compliance can apply to the written-approval requirement, but it argues that substantial evidence supports the Commission's decision that Atkins did not substantially comply with the requirement.[45]

The purpose of AS 23.30.015(h) is "to allow employees to seek damages from third-party tortfeasors without jeopardizing their compensation while, at the same time, allowing employers to share in damage awards up to the limit of their exposure under the workers' compensation law."[46] We do not disagree with the parties that there may be times when an employee can show that his conduct "falls short of strict compliance" with the written-approval requirement but gives the employer the same

---

[45]    The Fund also asserts that under AS 23.30.082 Atkins was required to get the Fund's approval of any third-party settlement, even though it never paid anything to him. We do not address this argument because we need not do so.

[46]    *Forest*, 830 P.2d at 781.

protection that the statute is intended to provide.[47] But nothing in the record here indicates that Rader ever told Inlet Taxi or Roper about Atkins's workers' compensation claim even though Rader had advised Atkins to try to secure compensation and was aware that Atkins was trying to pursue a claim. Roper's or Inlet Taxi's potential liability to Atkins for a workers' compensation claim would have been different from its liability under its commercial liability policy, which paid Atkins pursuant to its underinsured motorist coverage. Any assent from the commercial carrier to a policy-limits settlement would not have been given with an awareness of Roper's or Inlet Taxi's potential exposure to workers' compensation liability. Rader's letters to Inlet Taxi and Roper that he was representing Atkins in the third-party claim — which according to Rader had the purpose of "find[ing] out about their insurance coverage" and "get[ting] them to cooperate with [the] third-party claim" — may have given them some notice about negotiations. But giving notice is not the same as getting approval of a policy-limits settlement, even if Inlet Taxi and Roper were refusing to participate in the Board proceedings and did not communicate with Rader. Rader had the option of preserving Atkins's workers' compensation eligibility by obtaining a judgment against the estate rather than entering into a settlement without approval from Inlet Taxi or Roper.

On these facts we hold that Atkins did not show that his and Rader's conduct afforded Inlet Taxi or Roper the same protection that the statute would have provided.

**D.      The Commission Correctly Decided That Inlet Taxi Was Not Estopped From Using The Employer-Approval Defense.**

Of the equitable defenses he raised below, Atkins argues on appeal only that equitable estoppel applies to prevent the Fund from using Inlet Taxi's defense to

---

[47]      *See Adamson v. Municipality of Anchorage*, 333 P.3d 5, 14 (Alaska 2014) (quoting *Jones v. Short*, 696 P.2d 665, 667 n.10 (Alaska 1985)).

paying compensation.[48]  As he notes, equitable estoppel requires "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice."[49]  He argues that he has met all of these elements, contending that Inlet Taxi's failure to communicate coupled with the commercial carrier's adjuster "asserting that Mr. Rader should get the policy limits" constitutes equitable estoppel.

The adjuster's statement cannot reasonably be seen as an assertion of a position related to the Act's employer-approval provision.  The record does not suggest that the adjuster was aware of the workers' compensation claim, so any instruction to Rader about settlement was not tied to approval of a settlement for workers' compensation purposes.  Because an employer must pay compensation as set out in the Act regardless of fault,[50] the employer's potential liability and its motivation to recover damages from a third party could be significantly different in the workers' compensation context than it would be in an underinsured motorist claim.

Even if the adjuster's statement was a representation, it is hard to see how Rader could reasonably have relied on it when he was by his own admission unaware of the Act's employer-approval requirement.  Additionally, the adjuster represented the commercial liability carrier, not Inlet Taxi as an employer for workers' compensation purposes.  A commercial liability carrier would not make workers' compensation payments, so it would not have been reasonable for Rader to rely on a position asserted by the commercial liability carrier's adjuster when settling a workers' compensation

---

[48]    AS 23.30.082(c) allows the Fund to "assert the same defenses as an insured employer under [the Act]."

[49]    *Hull v. Alaska Fed. Sav. & Loan Ass'n of Juneau*, 658 P.2d 122, 126 (Alaska 1983).

[50]    AS 23.30.045(a)-(b).

claim.[51]

Finally, because Atkins had an alternative legal means of accomplishing the same result — he could have filed a lawsuit — prejudice is not clear either. At the second Board hearing, Atkins argued that there were risks involved in litigating the claim against the estate and that the actual recovery would be the same as the settlement regardless. But the alternative of filing suit existed. Had Rader sued the estate rather than settling, Atkins would have retained the ability to pursue his workers' compensation claim.

## V.    CONCLUSION

We AFFIRM the Commission's decision.

---

[51]    *See* AS 23.30.015(i) (providing that insurer who assumes payment of workers' compensation is subrogated to all rights of the employer).